Charles Blackmer Humphrey II and Dorothy F. Humphrey v. Commissioner.
Humphrey v. Commissioner
Docket No. 732-68.
United States Tax Court
T.C. Memo 1969-89; 1969 Tax Ct. Memo LEXIS 208; 28 T.C.M. (CCH) 492; T.C.M. (RIA) 69089; May 6, 1969, Filed *208 Richard F. Canning, 830 Hospital Trust Bldg., Providence, R.I., for the petitioners. Lawrence A. Wright, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax against petitioners in the amount of $2,874.02 for 1965. The sole issue is whether dividends received on certain stock are to be charged to petitioners rather than to the father of one of them. Findings of Fact Petitioners are husband and wife residing in Providence, Rhode Island. They filed their joint Federal income tax return for 1965 with the district director of internal revenue for the district of Rhode Island. The husband, Charles Blackmer Humphrey II, is now known as Blackmer Humphrey ("Blackmer"). On March 14, 1947, Blackmer's father Karl Humphrey ("Karl") transferred 2,000 shares of the common stock of General Electric Company, owned by him and registered in his name, into the name of Blackmer. These 2,000 shares have since become 6,000 shares by reason of splits. Karl was then 59 years old and Blackmer 31 years old. Karl was engaged in farming operations. There was an understanding between father and son that the stock was *209 to remain subject to the father's complete control, that the dividends from the stock would be disposed of as the father might direct, that the son would re-transfer to the father any portion of the stock that the latter might request, and that the son would become the full owner of the stock at his father's death except that he would pay the dividends to his mother for the remainder of her life. This arrangement was conceived by Karl as a device to defeat death taxes, Federal and state. Karl filed a gift tax return for 1947 reflecting the foregoing purported gift to Blackmer. At the time of the transfer of the stock into Blackmer's name the stock certificates were pledged with Industrial National Bank of Rhode Island ("the bank") or its predecessor as collateral security for a loan made by the bank to Karl in the amount of approximately $150,000. Karl signed the necessary stock powers, the bank sent out the certificates for transfer into Blackmer's name, and Blackmer signed all stock powers required by the bank so that when the certificates for stock were returned they would be pledged to secure Karl's loan and could be negotiated by the bank. The certificates of stock in Blackmer's *210 name were returned to the bank and held as security for Karl's loan. Karl had Blackmer sign whatever other papers the bank required of him with respect to the pledge of the certificates registered in Blackmer's name. During the first few years after the 1947 transfer the dividends were used to pay premiums on a policy of life insurance on the life of Karl owned by Blackmer. Thereafter, in need of funds due to farming losses, Karl had the policy converted into a paid-up policy, and the dividends were paid over to Karl. Blackmer merely endorsed the dividend checks, turned them over to Karl, and Karl repaid Blackmer enough to reimburse him for the increase in income taxes resulting from his apparent ownership of the stock. In 1959, 1960 and 1961, Karl arranged with an officer of the bank for the sale of an aggregate of 1,400 shares of the stock, which were sold as follows: Year
Number of shares
1959
500
1960
400
1961
500
1,400
These sales were made entirely at Karl's initiative, and Blackmer's only part therein was to sign whatever papers Karl presented to him in connection therewith. The net proceeds of the sales were deposited in Karl's account and he *211 used those proceeds for his own purposes. In addition, at Karl's request, an agregate of 1,150 shares were re-transferred from Blackmer's name to Karl's name in 1961, 1963 and 1965, as follows: Year
Number
of shares
1961
350
1963
500
1965
300
1,150 Blackmer filed a gift tax return for 1961 disclosing a purported gift of 350 shares of the stock to Karl. 494 The following table is a summary, for the years 1947 through 1967, of the total dividends on the stock received by Blackmer ("total dividends"); the amounts paid by Blackmer to Karl ("BH to KH: dividends"); the proceeds received by Karl from the sale of the stock registered in Blackmer's name ("BH to KH: proceeds from sale of stock"); the number of shares of stock transferred by Blackmer to Karl ("BH to KH: stock outright"); and the amount of repayments by Karl and his wife, Blackmer's mother, Marion M. Humphrey, to Blackmer ("KH and MMH to BH"): BH to
BH to KH: BH to KH:
Total
KH:
Proceeds from
Stock
KH & MMH
Year
Dividends
Dividends
sale ofstock
outright
to BH
1947
$ 2,400.00
$ 1,584.50
1948
3,400.00
1949
4,000.00
1950
7,600.00
$ 5,200.00
1951
5,700.00
5,700.00
1952
6,000.00
6,000.00
433.41
1953
8,000.00
8,000.00
500.00
1954
8,800.00
8,800.00
1,500.00
1955
9,600.00
9,600.00
1,000.00
1956
12,000.00
12,000.00
1,500.00
1957
12,000.00
12,000.00
3,500.00
1958
12,000.00
12,000.00
1,000.00
1959
11,500.00
11,500.00
a $39,676.08
3,000.00
1960
10,600.00
10,600.00
b 35,574.91
10,700.00
1961
9,550.00
7,250.00
c 32,335.63
350 shares
12,300.00
1962
8,500.00
6,375.00
1963
8,000.00
6,125.00
500 shares
1964
8,250.00
6,187.50
1954
8,625.00
6,137.51
d 300 shares
1966
9,165.00
9,165.00
1967
8,970.00
8,970.00
*212 The net income or loss of Karl and his wife, Marion M. Humphrey, as disclosed by their Federal joint income tax returns for the years 1944 through 1967 was as follows: Karl Humphrey and Marion
M. Humphrey Net income or
(loss) 1944-1967
Adjusted gross
Deductions and
Taxable
Year
income
exemptions
income
1944
$14,447.83
$ 8,308.98
$ 6,138.85
1945
15,940.95
4,885.40
11,055.55
1946
(7,612.16)
4,463.99
1947
(11,65 7.10)
6,106.07
1948
(10,873.49)
3,943.76
1949
(21,606.23)
10,589.10
1950
(35,316.96)
8,091.27
1951
(38,827.88)
6,970.78
1952
(25,270.54)
6,167.80
1953
(28,538.65)
4,304.50
1954
(19,866.33)
11,821.93
1955
(13,215.01)
9,268.5 0
1956
(21,033.25)
8,344.21
1957
(29,975.12)
5,526.67
1958
(18,708.84)
10,757.45
1959
(28,105.75)
9,563.53
1960
(35,815.74)
12,638.85
1961
(13,871.75)
13,106.30
1962
* 4,905.55
12,060.47
1963
8,566.56
18,375.91
1964
$21,834.81
** $19,716.05
$2,118.76
1965
*** 22,655.81
** 20,545.42
2,110.39
1966
*** 16,340.12
** 20,781.12
1967
***16,353.10
21,707.72
*213 On April 13, 1966, acting upon the advice of a lawyer, Karl and Blackmer entered into a written trust agreement "as of March 14, 1947," in which Karl purportedly transferred the original 2,000 shares in trust to Blackmer whereby Karl retained sweeping powers in respect of the transferred securities and the dividends therefrom which in effect retroactively supported the control which he in fact exercised during the preceding years. 495 Pursuant to advice given by Karl's accountant at about the time of the 1947 transfer, Blackmer reported the dividends on the General Electric stock in the income tax returns filed by him for the years 1947-1964. Beginning with the year 1965, after consulting counsel, Blackmer ceased reporting dividends from the stock in his returns. The Commissioner *214 determined a deficiency in petitioners' income tax for 1965 as the result of their failure to include in income dividends in the amount of $7,705 [1] paid in respect of the General Electric stock. Karl remained the true owner of the General Electric stock after the purported 1947 transfer; the dividends paid in 1965 belonged to Karl and were not in fact income to Blackmer. Opinion RAUM, Judge: The issue is entirely factual: Was there a transfer of real ownership of stock from Karl to his son in 1947, and did the dividends on the stock thereafter in fact belong to Karl or did they belong to Blackmer, the nominal owner thereof? Upon an appraisal of the evidence we have concluded that Karl remained the true owner of the stock and that it was he, rather than Blackmer, who was really the recipient of the dividends therefrom. [2] Those dividends must be ascribed to Karl, and not to Blackmer. It is a melancholy commentary upon *215 the entire matter that the situation before us arose from an amateurish attempt at "estate tax planning," cf. . If Karl had not entered into the 1947 transaction, the dividends would have been offset by his farming losses throughout most of the intervening period and no income taxes would have been payable thereon. Instead, substantial taxes were paid in respect thereof through Blackmer. The question nevertheless remains, raised for the first time for the year 1965, whether such dividends must be ascribed to Karl rather than to Blackmer, notwithstanding the form of the transaction. In our judgment on the record before us, Karl, and not Blackmer, was the true owner of the dividends. Blackmer is not accountable therefor. Decision will be entered for the petitioners. Footnotes
a. 500 shares on 4-3-59. ↩
b. 400 shares on 3-30-60. ↩
c. 300 shares on 1-18-61 and 200 shares on 4-26-61. ↩
d. 400 shares per 1965 gift tax return; but actually 300 per subsequent dividend payments, proxy forms, and bank records.↩
*. Operation of farm which resulted in losses in prior years was discontinued in 1962. ↩
**. Not including deduction for net operating losses carried forward from prior years. ↩
***. Not including dividends on stock in General Electric Company registered in the name of Charles Blackmer Humphrey II, which were included in gross income in the returns for 1965-1967 but not for the earlier years.↩
1. There is an unexplained difference between this figure and the $8,625 shown as total dividends for 1965 in the table, supra, p. 494.↩
2. We reach this conclusion without any reliance upon the so-called trust agreement executed in 1966 "as of" 1947.↩